**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **MATTHEW SKYRM and MATTHEW ROMAINE**, <br><br> Plaintiffs, <br><br> v. <br><br> **TASKUS, INC.**, <br><br> Defendant. | Civil Action No.  5:25-cv-01603-JKP-ESC <br><br><br> **JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT**

Plaintiffs, Matthew Skyrm and Matthew Romaine, by and through their undersigned counsel, hereby complain against Defendant, TaskUs, Inc., as follows:

PARTIES

1.      Plaintiff Matthew Skyrm ("Skyrm") is an adult individual and a resident and citizen of the State of Florida.

2.      Plaintiff Matthew Romaine ("Romaine") is an adult individual and a resident and citizen of the State of Washington.

3.      Defendant TaskUs, Inc. ("TaskUs") is a public corporation incorporated under the laws of the State of Delaware with its principal headquarters and principal place of business in New Braunfels, Comal County, Texas.

4.      Defendant TaskUs is an outsourcing company that handles content moderation, customer experience, artificial intelligence, operations and risk & response services for companies around the world.

JURISDICTION AND VENUE

5.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) over this

action between citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Defendant is a citizen of Texas.

6.    Venue is proper in the San Antonio Division of the Western District of Texas because Defendant TaskUs has its headquarters and principal place of business in this District and a substantial part of the acts complained of occurred in this District.

FACTUAL BACKGROUND

7.    Plaintiff Romaine has been involved in the artificial intelligence ("AI") business since approximately 2010.

8.    Romaine is the founder and former Chief Executive Officer of Gengo K.K. ("Gengo"). Based in Tokyo, Japan, Gengo is now a subsidiary of Gengo, Inc., a machine learning and translation service and AI provider that operates in the United States and many foreign countries.

9.    From its inception in 2009, Gengo's main business was translation and localization (*i.e.*, adjusting expressions to suit each country) services for natural persons.

10.    On or about June 18, 2009, Romaine entered into an employment agreement with Gengo and was employed as its Chief Technology Officer or Chief Executive Officer from that date until May 1, 2021.

11.    Plaintiff Skyrm also has been involved in the AI business since approximately 2010.

12.    Skyrm became an advisor to Gengo in or about January 2010. On or about April 1, 2012, Skyrm entered into an employment agreement with Gengo and was employed as its Chief Operating Officer from that date until May 1, 2021.

13.    Beginning in or around 2017, through Plaintiffs' efforts, Gengo greatly expanded

its AI business of designing and providing training data and services for clients that are engaged in the machine learning business.

14.     In January 2019, Lionbridge Technologies, LLC ("Lionbridge"), through its wholly-owned Japanese subsidiary, Lionbridge Japan K.K., acquired all the outstanding shares of Gengo Inc., the parent company of the Gengo, to strengthen Lionbridge's AI business (the "Gengo Acquisition").

15.     Non-party Lionbridge is a private limited liability corporation incorporated under the laws of the State of Delaware with its headquarters and principal place of business in Waltham, Middlesex County, Massachusetts, that provides translation and localization in many languages, with offices in the United States and approximately 25 foreign countries.

16.     Lionbridge was a public company until 2016, when it was acquired by the private equity firm H.I.G. Capital, LLC ("HIG").  Non-party HIG is a limited liability corporation incorporated under the laws of the State of Delaware, with its headquarters and principal place of business in Miami, Dade County, Florida.

17.     Lionbridge was known as Lionbridge Technologies, Inc., until it was converted into a limited liability and renamed company in 2022.

18.     Lionbridge acquired Gengo to obtain its advanced technological and marketing capabilities that Lionbridge did not possess.

19.     Lionbridge intended to grow and expand the AI business after it completed the acquisition of Gengo with a view toward making Lionbridge more valuable as a potential public company or acquisition target. Lionbridge's plan was to bring the company public through an initial public offering or sell either the entire company or its AI business to a third party.

20.     Following the Gengo Acquisition, Lionbridge specifically employed Plaintiffs to

grow and expand the AI business for Lionbridge to execute upon its strategy to go public or find a buyer.

21.     Following the Gengo Acquisition, Plaintiffs continued to be responsible for Gengo's AI technology, sales, marketing, management, staff, and recruiting, as well as planning the business strategy for the company's AI business.

22.     In or around May 2019, about five months after the Gengo Acquisition, Ed Jay ("Jay") was appointed as President of Lionbridge and was instructed to expand the AI business of Lionbridge. Thereafter, Plaintiffs began to receive instructions from Jay in addition to those from Fennelly regarding the AI business and were repeatedly instructed to grow and expand the AI business until Lionbridge could be taken public or sold to a third-party or the AI business could be sold.

23.     Plaintiffs diligently and faithfully performed their duties as Lionbridge employees and successfully grew and expanded the AI business of Lionbridge.

24.     In recognition of their important role at Gengo, to retain Plaintiffs after the acquisition, to encourage them to grow the AI business and position it for a sale to a third-party, and to compensate Plaintiffs for the duties they would continue to perform after the Gengo Acquisition, Lionbridge gave Plaintiffs special terms and conditions of employment.

A.     The RSU Grants

25.     In particular, to retain Plaintiffs and induce them to remain employees after the Gengo Acquisition and to encourage Plaintiffs to grow the AI business and position it for a sale to a third-party, on or about February 25, 2019, each Plaintiff was granted 200,000 restricted stock units ("RSUs") by LBT Investment Holdings, LLC ("LBT"), the holding company that then owned, directly or indirectly, 100% of the common stock of Lionbridge and owned or

controlled, directly or indirectly, all of Lionbridge's AI business. The RSUs were subject to an RSU Plan and RSU Agreement of Lionbridge Technologies, Inc. (the "RSU Agreement").

26.     The RSU Agreement provided that 100,000 RSUs granted to each Plaintiff were subject to vesting over time ("Time Vesting RSUs"), pursuant to which those 100,000 RSUs vested at the rate of 20% per year on the anniversary of the Vesting Start Date of January 16, 2019, beginning on January 16, 2020.

27.     The RSU Agreement further provided that the 100% of the Time Vesting RSUs would immediately vest upon the "occurrence of a Sale of the Company." The term "Sale of the Company" was defined in the Amended and Restated Limited Liability Company Agreement of LBT Holdings, LLC dated as of February 28, 2017 (the "LLC Agreement"). The LLC Agreement defined the Company as LBT and defined the Sale of the Company as the sale of the Company or any Subsidiary of the Company that holds all or substantially all of assets of the Company and its Subsidiaries.

28.     The LLC Agreement defined a Subsidiary as "any corporation, company, partnership, association or other business entity" owned or controlled, directly or indirectly, by LBT.

29.     The RSU Agreement also provided that the remaining 100,000 RSUs granted to each Plaintiff were subject to vesting based on the distributions paid by LBT to HIG and its affiliates under Section 5.1 of the LLC Agreement ("Performance Vesting RSUs"). Half of the Performance Vesting RSUs vested if the distributions paid by LBT to HIG and its affiliates equaled a "Return Multiple" of 2.5 times the amount of the aggregate investment made by HIG and its affiliates in the Company. The remaining one-half of the Performance Vesting RSUs vested if the distributions paid by LBT to HIG and its affiliates equaled a "Return Multiple" of

three times the amount of the aggregate investment made by HIG and its affiliates in the Company.

30.    Pursuant to the terms of the Lionbridge Technologies, Inc. RSU Plan and the RSU Agreement, the RSUs entitled the holders of vested RSUs to receive certain cash payments in the event of consummation of a Sale of the Company or a change in control of the ownership of a substantial portion of the assets of the corporation.

31.    When the RSUs were granted to Plaintiffs, the AI business of Lionbridge, which included the business it acquired from Gengo in January 2019, was still conducted by a separate business entity under the name "Gengo." That business was not rebranded as Lionbridge until December 2019, nearly a year after the RSUs were granted to Plaintiffs. At or about that time, Lionbridge created a website called "Lionbridge.AI" to highlight its emphasis on the AI portion of its business.

32.    Even after the AI business of Lionbridge was rebranded, it was still conducted by a separate business entity.

33.    On or about December 31, 2020, Lionbridge sold its AI business to Telus International Inc. ("Telus") for approximately $930 million (the "AI Sale"). Non-party Telus is a Canadian telecommunications company with its headquarters and principal place of business in Vancouver, British Columbia, Canada. Telus provides diverse digital information technology and cloud services, AI-fueled automation, trust, and safety services, AI data services, and front-end digital design and consulting services.

34.    Upon information and belief, as part of the AI Sale, Lionbridge agreed to significant non-competition and related restrictions limiting its ability to engage in the AI services it had sold to Telus, which Lionbridge senior leadership communicated internally when

6

announcing the AI Sale.

35.    Defendant TaskUs provides customer support, technical support, and other back-office services to Telus.

36.    As of 2016, the enterprise valuation for Lionbridge implied by the share price agreed to in the HIG "going private" transaction was roughly $325 to $350 million. This means that the AI segment of Lionbridge's business grew rapidly in value between 2016 and 2021. When the AI division was sold to Telus in December 2020, it was the most valuable part of Lionbridge's business, even if it was not the largest (by headcount, revenue, or otherwise).

37.    When Lionbridge sold the AI business to Telus for $930 million, the AI business was by far the most profitable, fastest growing, and most valuable of Lionbridge's business and by far the most profitable, fastest growing, and most valuable of the assets of LBT, Lionbridge's holding company.

38.    Thus, the sale of the AI business to Telus was a "Sale of the Company" as defined by the LLC Agreement and for purposes of the Time Vesting RSUs under the RSU Agreement, and caused 100% of Plaintiffs' Time Vesting RSUs to vest immediately.

39.    The sale of the AI business to Telus was a change in control of the ownership of a substantial portion of the assets of the corporation as provided for in the RSU Agreement, and thus entitled Plaintiffs to a one-time cash payment in an amount equal to the Per RSU Proceeds (defined as an amount equal to the fair market value as determined by the Board of a Class B Common Unit of Parent) as of the date of the Payment Date multiplied by the number of each holder's Vested RSUs that remain outstanding at the Payment Date.

40.    Upon information and belief, as of 2016, the enterprise value of Lionbridge of approximately $325 to $350 million represented a positive return on the aggregate investment

made by HIG and its affiliates in the Company.

41.     Upon information and belief, when the AI business of Lionbridge was sold to Telus on December 31, 2020, for $930 million, distributions were paid to HIG and its affiliates under Section 5.1 of the LLC Agreement equal to or greater than three times the amount of the aggregate investment made by HIG and its affiliates in the Company.

42.     Thus, for purposes of the Performance Vesting RSUs under the RSU Agreement, the Return Multiple paid to HIG and its affiliates following the AI Sale caused 100% of Plaintiffs' Performance Vesting RSUs to vest immediately.

43.     Based in part on the RSU Agreement, Plaintiffs continued with their efforts to grow and expand the AI business and to ensure the highly profitable sale of the AI business to Telus and a successful transfer of the business following the sale.

B.      The Bonus Payments

44.     In addition, to retain Plaintiffs and induce them to remain employees after the Gengo Acquisition and to encourage them to grow the AI business and position it for a sale to a third-party, Lionbridge agreed to pay Plaintiffs an annual bonus and a two-year bonus (the latter of which Fennelly frequently referred to as an "earn-out") (together, the "Bonus Payments") in addition to their regular wages.

45.     The Bonus Payments were to be paid to Plaintiffs according to the percentage of achievement of their target goals set forth in the Goal Sheets and were set forth in an agreement titled "MANAGEMENT INCENTIVE PLAN and GENGO TWO YEAR PLAN for KEY GENGO EMPLOYEES" (the "MIP Agreement"). The MIP Agreement was sent to Plaintiffs by email on January 12, 2019, from Ann Lazarus-Barnes, Lionbridge's Human Resources Director.

46.     In the latter half of 2020, as Lionbridge was negotiating the AI Sale to Telus, to

retain Plaintiffs and induce them to remain as valuable employees of the AI business and increase the desirability of the AI business to Telus, and hence its value, Lionbridge agreed to pay a special bonus (which Fennelly frequently referred to as the "dividend") to Plaintiffs (the "Special Bonuses") if the AI Sale took place.

47.    Plaintiffs were repeatedly told of the Special Bonuses in November and December 2020 and reached an agreement with Lionbridge for the Special Bonuses on or about December 7, 2020.

48.    While Lionbridge was negotiating the sale of the AI business to Telus, on November 6, 2020, John Fennelly ("Fennelly"), the Chief Executive Officer of Lionbridge, told Plaintiffs they would be paid their Special Bonuses if the Business Transfer was closed.

49.    On December 7, 2020, as Lionbridge continued to negotiate the AI Sale with Telus, Fennelly again told Plaintiffs on another telephone call the amount of the Special Bonuses and agreed to it on behalf of Lionbridge. The Special Bonuses to Plaintiffs were $600,000 per person.

50.    Based in part on the agreement for the Special Bonuses, Plaintiffs continued with their efforts to grow and expand the AI business and to ensure the highly profitable sale of the AI business to Telus and completion of the business transfer following the sale.

C.    Plaintiffs' Resignation for Good Cause

51.    Following the AI Sale, Plaintiffs' roles, responsibilities, and reporting structures were materially and adversely changed. Their primary duties related to the AI business were eliminated, their teams were reassigned, and their management responsibilities were severely diminished.

52.    On or about January 29, 2021, pursuant to the terms of their RSU Agreements,

9

both Plaintiffs submitted formal notice of their resignation for "Good Reason," detailing the adverse changes to their positions.

53.     The resignation for Good Reason entitled each Plaintiff to additional consideration, including a severance payment equal to one year of their base salary and an amount equal to their on-target annual bonus, totaling approximately $325,000 for each Plaintiff. Lionbridge has failed and refused to pay this contractually-mandated severance.

D.     Plaintiffs' Employment by TaskUs

54.     Plaintiffs Romaine and Skyrm worked for Lionbridge until they departed from their employment by Lionbridge on or about May 1, 2021.

55.     Despite giving Plaintiffs repeated assurances that their bonuses would be paid and their RSUs would be distributed following the AI Sale in order to induce Plaintiffs to work diligently to grow and expand Lionbridge's AI business and aid Lionbridge's efforts to sell all or substantially all of the business, Lionbridge has failed and refused to pay their bonuses or distribute their RSUs after Plaintiffs departed their employment following the AI Sale.

56.     After Plaintiffs Romaine and Skyrm departed as employees of Lionbridge, they became employed by Defendant TaskUs on or about May 2, 2021. Plaintiff Romaine was employed as a consultant to TaskUs.  Plaintiff Skyrm was employed as Vice President, Head of AI Operations, of TaskUs.

57.     As consultant to TaskUs through Activation Labs, LLC, a wholly-owned company, Plaintiff Romaine was responsible for supporting the company's AI Operations    .

58.     As VP, Head of AI Operations, of TaskUs, Plaintiff Skyrm was responsible for the company's AI Operations service line.

59.     To induce Plaintiffs to accept employment by TaskUs, TaskUs offered to

indemnify Plaintiffs against certain losses in the event of adverse action taken by Lionbridge, including in particular assurances that TaskUs would indemnify Plaintiffs if Lionbridge breached their employment agreements by failing to grant them RSUs or make any payments owed to Plaintiffs and to pay Plaintiffs' legal fees if they became involved in litigation with Lionbridge because of their departure from Lionbridge and subsequent employment by TaskUs.

60.    On January 21, 2021, TaskUs entered into identical indemnity agreements with Plaintiffs Romaine and Skyrm (the "Indemnity Agreements").

61.    The Indemnity Agreements, which were drafted and prepared by Jeff Chugg ("Chugg"), Head of Legal for TaskUs, provided in relevant part:

> TaskUs agrees to indemnify you and hold you harmless from and against all Expenses that you incur that are in direct consequence of any actual or threatened lawsuit, arbitration demand, or other proceeding initiated by Lionbridge or any other individual or entity against you in which it is alleged, or initiated by you against Lionbridge when it is necessary to enforce your right to defend from their argument, that your employment or other service provider relationship (including any services as an advisor, consultant or other such role) with the Company: (i) constitutes a violation of any employment or other agreement with or relating to Lionbridge; (ii) constitutes breach(es) of any other duty, duties, or obligation(s) arising from any contractual provision(s) and/or applicable law(s); and/or (iii) otherwise violates any other applicable law(s), regulation(s), dut(ies), ordinance(s) or similar restrictions. For the avoidance of doubt, this indemnification obligation shall apply to any actual or threatened claims or causes of action arising out of or related to your separation from Lionbridge and subsequent employment with or services provided to TaskUs, including any alleged breach of any agreement or other obligation relating to the protection of trade secrets or confidential information, or non-solicitation of customers or employees, or any other potentially related claims.

62.    The Indemnity Agreements included the following expansive definition of "Expenses":

> "Expenses" include but are not limited to all actually incurred attorneys' fees, retainers, court costs, transcript costs, fees and costs of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, or

11

otherwise participating in, a lawsuit and/or arbitration proceeding. Expenses also include (i) Expenses incurred in connection with any appeal resulting from any lawsuit or arbitration proceeding, including without limitation the premium, security for, and other costs relating to any cost bond, supersedeas bond or other appeal bond or their equivalent; (ii) expenses you incur in connection with the interpretation, enforcement or defense of your rights under this agreement; (iii) any amounts paid in settlement or the amount of judgments or fines against you; and (iv) any related losses suffered by you as the result of Lionbridge refusing to pay or provide payments, bonuses, or other compensation properly due and owing to you as a result of the your departure from Lionbridge or any effort to recapture any such payments as a result of the conduct addressed in this letter.

63.     The Indemnity Agreements further provide that TaskUs "shall advance the Expenses that are subject to indemnification under this agreement… as soon as reasonably practicable … but in any event no later than 30 days, after the receipt by the Company of a written statement … requesting such advances," and that TaskUs's indemnification and advancement obligations "shall survive" any resignation or termination.

64.     Thus, under the terms of the Indemnity Agreements drafted and prepared by Chugg as Head of Legal for TaskUs, TaskUs expressly and unconditionally agreed to pay Plaintiffs "any related losses suffered by you as the result of Lionbridge *refusing to pay or provide payments, bonuses, or other compensation properly due and owing to you* as a result of the your departure from Lionbridge or any effort to recapture any such payments as a result of the conduct addressed in this letter." (Emphasis added.)

65.     In particular, following Plaintiffs' departure as employees of Lionbridge and their subsequent employment by TaskUs, Lionbridge has failed to pay most of the regular Bonus Payments it owed to Plaintiffs for the year 2020.

66.     Plaintiff Romaine is owed $100,000 as his unpaid bonus for 2020.

67.     Plaintiff Skyrm also is owed $100,000 as his unpaid bonus for 2020.

68.     In addition, following Plaintiffs' departure as employees of Lionbridge and their subsequent employment by TaskUs, Lionbridge has failed to pay the two-year Bonus Payments

12

it owed to Plaintiffs.

69.    After Plaintiffs questioned their compensation, Fennelly sent an email dated Feb 12, 2021, in which he said, "As you both know, your choreographed delivery of letters disputing your employment was sent to the team subsequent to my last communication to you regarding compensation. The letters have been passed on to our legal team who are reviewing your assertions and demands. This will take some time and will move any discussion about compensation out until your allegations are properly reviewed."

70.    When Lionbridge withheld the Bonus Payments and refused to deliver the RSUs to Plaintiffs, it cited Plaintiff Skyrm's employment at TaskUs, which it characterized as a "competitor," as a reason for it to breach the terms of the RSU agreement.

71.    In filings submitted to the Tokyo District Court on or about March 15, 2024 (and thereafter), Lionbridge expressly argued that Plaintiff Skyrm's employment by TaskUs— characterized as a "competitor"—forfeited his RSU rights, directly linking Plaintiffs' TaskUs employment to Lionbridge's non-payment.

72.    Plaintiff Romaine is owed $270,000 as his unpaid two-year bonus.

73.    Plaintiff Skyrm is owed $270,000 as his unpaid two-year bonus.

74.    Following Plaintiffs' departure as employees of Lionbridge and their subsequent employment by TaskUs, Lionbridge also has failed to pay any of the Special Bonuses it owed to Plaintiffs as a result of the AI Sale.

75.    Plaintiff Romaine is owed between $600,000 and $1,200,000 as his unpaid Special Bonus on the closing of the AI Sale. In addition, Plaintiff Romaine is still $37,500 from his 2019 bonus that Lionbridge withheld after his departure from the company.

76.    Plaintiff Skyrm is owed between $600,000 and $1,200,000 as his unpaid Special

Bonus on the closing of the AI Sale.

77.     Furthermore, following Plaintiffs' departure as employees of Lionbridge and their subsequent employment by TaskUs, Lionbridge failed to make the payments required under the RSUs to Plaintiffs after the AI Sale.

78.     Lionbridge has claimed that by accepting employment with TaskUs, Plaintiff Skyrm breached his RSU agreement and is not entitled to the vested RSUs.

79.     Before and after they became employed by TaskUs, Plaintiffs sought assurances from Jeff Chugg, Head of Legal for TaskUs, regarding protection from TaskUs in the event that Lionbridge refused to pay them their Regular Bonuses and Special Bonuses and withheld their RSUs.

80.     As Head of Legal for TaskUs, Chugg repeatedly assured Plaintiffs that TaskUs would indemnify them from and against the "Expenses" they incurred to enforce their rights against Lionbridge, including their rights to the Regular Bonuses and Special Bonuses and their rights under the RSU Agreement.

81.     Before and after they became employed by TaskUs, Bryce Maddock ("Maddock"), co-founder and Chief Executive Officer of TaskUs, and Jaspar Weir ("Weir"), co-founder and President of TaskUs, told Plaintiffs on more than one occasion that the Board of Directors of TaskUs had approved the terms and conditions of their employment, including that TaskUs would indemnify Plaintiffs if Lionbridge breached their employment agreements by failing to grant them RSUs or make any payments owed to Plaintiffs and would pay Plaintiffs' legal fees if they became involved in litigation with Lionbridge because of their because of their departure from Lionbridge and subsequent employment by TaskUs.

82.     Before and after they became employed by TaskUs, Maddock and Weir told

14

Plaintiffs on more than one occasion that the TaskUs Board had "accepted" the risk of indemnifying them, including the full cost for their legal fees if they became involved in litigation with Lionbridge because of their because of their departure from Lionbridge and subsequent employment by TaskUs.

83.    Before and after they became employed by TaskUs, Chugg repeatedly assured Plaintiffs that TaskUs would make them whole if Lionbridge failed to pay them their Regular Bonuses and Special Bonuses and if Lionbridge failed to deliver their RSUs, including that TaskUs would make them whole if Lionbridge relied upon their employment by TaskUs in withholding the Bonus Payments or the RSU payments.

84.    Before and after they became employed by TaskUs, Chugg also repeatedly assured Plaintiffs that TaskUs would indemnify them for the cost of any legal fees they incurred if they became involved in litigation with Lionbridge because of their departure from Lionbridge and subsequent employment by TaskUs.

85.    After Chugg changed positions at TaskUs, Claudia Walsh was named General Counsel of TaskUs. Thereafter, Plaintiffs had one or more discussions with Walsh to confirm Chugg's assurances Plaintiffs that TaskUs would make them whole if Lionbridge failed to pay them their Regular Bonuses and Special Bonuses and if Lionbridge failed to make the payments required under their RSUs. Walsh provided that assurance to Plaintiffs, including on February 8, 2022, during a meeting with Chugg and Vanessa Patel, and TaskUs legal requested and received legal-fee forecasts for internal budgeting.

86.    In reasonable and justifiable reliance on the assurances from Chugg and from Walsh that TaskUs would indemnify them from and against the "Expenses" they incurred to enforce their rights against Lionbridge, including their rights to the Bonus Payments and the

15

Special Bonuses and their right to payments under the RSU Agreement, Plaintiffs commenced a legal proceeding in Japan against Lionbridge in which they asserted, among other things, claims based upon Lionbridge's failure to pay Plaintiffs their Regular Bonuses and Special Bonuses and failed to grant Plaintiffs any RSUs.

87.    From time to time, Plaintiffs submitted requests for payment of their legal fees, including fees incurred to draft the indemnity agreement, handle negotiations between Plaintiffs and Lionbridge, and in prosecuting the action in Japan as "Expenses" covered under the Indemnity Agreements.

88.    Prior to September 2024, TaskUs routinely paid Plaintiffs' requests for payment of their legal fees incurred in prosecuting the action in Japan as "Expenses" covered under the Indemnity Agreements. In total, from 2021 to September 2024, TaskUs paid $134,016 in legal fees and expenses Plaintiffs incurred to prosecute the action against Lionbridge in Japan.

89.    On or about November 30, 2023, TaskUs terminated Plaintiff Skyrm's employment, and around that time ended Plaintiff Romaine's consulting engagement. In connection with Skyrm's termination, TaskUs presented a proposed severance agreement requiring a release of rights under the Indemnity Agreements.

90.    After reasonable opportunity for discovery and investigation, Plaintiffs believe the evidence will show that despite the assurances given to Plaintiffs by Maddock and Chugg, among others, TaskUs only ever intended to pay negligible sums to indemnify them in the event they became parties to litigation with Lionbridge following their departure from Lionbridge and subsequent employment by TaskUs.

91.    After reasonable opportunity for discovery and investigation, Plaintiffs believe the evidence will show that despite the assurances given to Plaintiffs by Maddock and Chugg,

16

among others, the TaskUs Board never intended to indemnify Plaintiffs for more than negligible sums in the event they became parties to litigation with Lionbridge following their departure from Lionbridge and subsequent employment by TaskUs.

92. On or about March 2, 2024, Maddock called one of the indemnified individuals to propose "cancelling the deal for a payout," stating the "open-ended liability" of the indemnity was "bad" for TaskUs.

93. However, on October 18, 2024, in response to an inquiry from Plaintiff Skyrm, TaskUs abruptly informed Plaintiffs that it would no longer pay any of Plaintiffs' "Expenses" under the Indemnity Agreement. On that date, TaskUs sent a letter to Plaintiffs via email, signed by "TaskUs Legal" presumably at the direction of Walsh, informing Plaintiffs that it would cease making payments under the Indemnity Agreements and threatened to seek to recover all payments previously paid under the Indemnity Agreements.

94. At present, Plaintiffs have incurred approximately 1,466,886 Japanese Yen (approximately $10,330) in unreimbursed legal fees and expenses to prosecute the action against Lionbridge in Japan and will continue to incur such fees and expenses until the action in Japan is concluded.

95. TaskUs's refusal to advance Expenses has impeded Plaintiffs' ability to fully prosecute claims against Lionbridge, including retaining specialized Delaware counsel and investigative resources concerning RSU issues.

96. Despite Plaintiffs' repeated demands on TaskUs to perform its obligations under the Indemnity Agreements, including in particular its obligation to pay "Expenses" including the fees and expenses Plaintiffs have incurred and will continue to incur to prosecute the action against Lionbridge in Japan and to pay Plaintiffs any losses they have suffered "as the result of

17

Lionbridge *refusing to pay or provide payments, bonuses, or other compensation properly due and owing to [Plaintiffs]* as a result of the [their] departure from Lionbridge," TaskUs has continued to refuse to perform its duties under the Indemnity Agreements.

COUNT I
BREAK OF CONTRACT

97.    Plaintiffs incorporate by reference paragraphs 1 through 96 above as if set forth at length herein.

98.    Plaintiffs accepted employment by TaskUs in part in reasonable and justifiable reliance on the terms and promises set forth in the Indemnity Agreements, including in particular TaskUs's agreement to indemnify them from and against any losses Plaintiffs have suffered "as the result of Lionbridge *refusing to pay or provide payments, bonuses, or other compensation properly due and owing to [Plaintiffs]* as a result of the [their] departure from Lionbridge."

99.    Plaintiffs remained employed by TaskUs and devoted substantial time and effort to the AI business of TaskUs in part in reasonable and justifiable reliance on the terms and promises set forth in the Indemnity Agreements.

100.    Plaintiffs also remained employed by TaskUs and devoted substantial time and effort to the AI business of TaskUs in part in reasonable and justifiable reliance on the representations and assurances of Chugg and from Walsh that TaskUs would honor the terms of the Indemnity Agreements.

101.    Plaintiffs also remained employed by TaskUs and devoted substantial time and effort to the AI business of TaskUs in part in reasonable and justifiable reliance on the partial performance of TaskUs under the Indemnity Agreements.

102.    Plaintiffs also remained employed by TaskUs and devoted substantial time and effort to the AI business of TaskUs, and commenced and have prosecuted the legal action against

18

Lionbridge in Japan, in part in reasonable and justifiable reliance on the terms and promises set forth in the Indemnity Agreements.

103. The partial payments made by TaskUs of Plaintiffs' fees and expenses incurred to prosecute the action against Lionbridge in Japan are consistent with the terms of the Indemnity Agreements and not easily explainable by some other purpose.

104. As such, the partial payments made by TaskUs of Plaintiffs' fees and expenses incurred to prosecute the action against Lionbridge in Japan point to the existence of an enforceable agreement to pay those fees and expenses.

105. Plaintiffs commenced the action against Lionbridge in Japan and incurred fees and expenses to prosecute the action against Lionbridge in Japan based on the genuine belief that an enforceable agreement for indemnification from TaskUs existed.

106. Consistent with their genuine belief that an enforceable agreement for indemnification from TaskUs existed, Plaintiffs incurred significant fees for counsel to advise on their rights under the Indemnity Agreement and to commence and prosecute the action against Lionbridge in Japan to their detriment, which indicates reliance on the Indemnity Agreements.

107. The terms of the Indemnity Agreements were and are binding and enforceable promises and representations by TaskUs.

108. In breach of the terms of the Indemnity Agreements, TaskUs has ceased performing its obligations thereunder and is in material breach of the Indemnity Agreements.

109. In breach of the terms of the RSU Agreement, Lionbridge and LBT failed to make any payments under the RSUs to Plaintiffs upon the sale of the AI business to Telus on December 31, 2020, and continue to refuse to make any payments required under the RSUs issued to Plaintiffs.

19

110.    In breach of the terms of the Regular Bonuses, Lionbridge and LBT failed to pay the full amount of the Regular Bonuses owed to Plaintiffs and continue to refuse to pay the full amount of the Regular Bonuses to Plaintiffs.

111.    In breach of the terms of the Special Bonuses, Lionbridge and LBT failed to pay the Special Bonuses owed to Plaintiffs and continue to refuse to pay the Special Bonuses to Plaintiffs

112.    Plaintiffs have been harmed as a direct, proximate, and foreseeable result of the breaches of contract by Lionbridge and LBT in amounts to be proven at trial.

COUNT II
PROMISSORY ESTOPPEL

113.    Plaintiffs incorporate by reference paragraphs 1 through 96 above as if set forth at length herein.

114.    Plaintiffs accepted employment by TaskUs in part in reasonable and justifiable reliance on the terms and promises set forth in the assurances repeatedly given to Plaintiffs and in the Indemnity Agreements, including in particular TaskUs's agreement to indemnify them from and against any losses Plaintiffs have suffered "as the result of Lionbridge *refusing to pay or provide payments, bonuses, or other compensation properly due and owing to [Plaintiffs]* as a result of the [their] departure from Lionbridge."

115.    Plaintiffs remained employed by TaskUs, devoted substantial time and effort to the AI business of TaskUs, and did not pursue other employment opportunities in part in reasonable and justifiable reliance on the terms and promises set forth in the assurances repeatedly given to Plaintiffs and in the Indemnity Agreements.

116.    Plaintiffs remained employed by TaskUs, devoted substantial time and effort to the AI business of TaskUs, and did not pursue other employment opportunities in part in

reasonable and justifiable reliance on the representations and assurances of Chugg, Maddock, and Walsh that TaskUs would honor the assurances given to Plaintiffs and perform the Indemnity Agreements.

117.    Plaintiffs remained employed by TaskUs, devoted substantial time and effort to the AI business of TaskUs, and did not pursue other employment opportunities in part in reasonable and justifiable reliance on the terms and promises set forth in the assurances repeatedly given to Plaintiffs and on the partial performance of TaskUs under the Indemnity Agreements.

118.    Plaintiffs also remained employed by TaskUs and devoted substantial time and effort to the AI business of TaskUs, commenced and have prosecuted the legal action against Lionbridge in Japan, and incurred considerable expenses to do so in part in reasonable and justifiable reliance on the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the terms and promises set forth in the Indemnity Agreements.

119.    TaskUs has ceased performing its obligations thereunder and is in material breach of the Indemnity Agreements.

120.    In breach of the terms of the RSU Agreement, Lionbridge and LBT have failed to make any payments due under the RSUs to Plaintiffs upon the sale of the AI business to Telus on December 31, 2020, and continue to refuse to deliver any Performance Vesting RSUs to Plaintiffs.

121.    In breach of the terms of their promises to Plaintiffs, Lionbridge and LBT have failed to pay the full amount of the Bonus Payments owed to Plaintiffs and continue to refuse to pay the full amount of the Regular Bonuses to Plaintiffs.

122.    In breach of the terms of the Special Bonuses, Lionbridge and LBT have failed to

pay the Special Bonuses owed to Plaintiffs and continue to refuse to pay the Special Bonuses to Plaintiffs

123.    Plaintiffs have been harmed as a direct, proximate, and foreseeable result of the justifiable reliance on the promises made by TaskUs in amounts to be proven at trial.

124.    Plaintiffs have been harmed as a direct, proximate, and foreseeable result of the justifiable reliance on the promises and representations made by Chugg on behalf of TaskUs in amounts to be proven at trial.

COUNT III
FRAUD

125.    Plaintiffs incorporate by reference paragraphs 1 through 96 above as if set forth at length herein.

126.    Plaintiffs accepted employment by TaskUs in part in reasonable and justifiable reliance on the terms and promises set forth in the Indemnity Agreements.

127.    Plaintiffs remained employed by TaskUs and devoted substantial time and effort to the AI business of TaskUs in part in reasonable and justifiable reliance upon the terms and promises set forth in the Indemnity Agreements.

128.    Plaintiffs commenced and have prosecuted the legal action against Lionbridge in Japan, and have incurred considerable expenses to do so, in part in reasonable and justifiable reliance upon the terms and promises set forth in the Indemnity Agreements.

129.    TaskUs knew that Plaintiffs would accept employment, remain employed, and perform their employment duties in reasonable and justifiable reliance on the terms and promises set forth in the Indemnity Agreements.

130.    TaskUs knew that Plaintiffs would commence and prosecute the litigation against Lionbridge in Japan in reasonable and justifiable reliance on the terms and promises set forth in

the assurances repeatedly given to Plaintiffs and the terms and promises set forth in the Indemnity Agreements.

131. TaskUs intended to induce Plaintiffs to accept employment, remain employed, perform their employment duties, and commence and prosecute the litigation against Lionbridge in Japan in reasonable and justifiable reliance on the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the terms and promises set forth in the Indemnity Agreements.

132. When TaskUs induced Plaintiffs to accept employment, remain employed, and perform their employment duties in reasonable and justifiable reliance on the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the terms and promises set forth in the Indemnity Agreement, TaskUs did not intend to perform pursuant to the terms and promises set forth therein and intended to breach the Indemnity Agreement.

133. To the contrary, after reasonable opportunity for discovery and investigation, Plaintiffs believe the evidence will show that despite offering employment terms and making promises set forth in the Indemnity Agreement as alleged above, TaskUs only ever intended to pay, if anything, a negligible sum under the Indemnity Agreement and never intended to perform its obligations under the Indemnity Agreement if the cost of doing so exceeded a negligible sum.

134. After reasonable opportunity for discovery and investigation, Plaintiffs believe the evidence will show that when TaskUs induced Plaintiffs to accept employment, remain employed, and perform their employment duties in reasonable and justifiable reliance on the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the terms and promises set forth in the Indemnity Agreements, TaskUs knew that the terms and promises set forth therein were false, untrue, and misleading.

23

135.    Plaintiffs reasonably and justifiably relied upon the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the terms and promises set forth in the Indemnity Agreements and TaskUs's agreement to pay their Expenses thereunder.

136.    TaskUs has failed and refused to perform pursuant to the terms and promises set forth in the assurances repeatedly given to Plaintiffs or the terms and promises set forth in the Indemnity Agreements.

137.    Plaintiffs have been harmed as a direct, proximate, and foreseeable result of the fraud of TaskUs in amounts to be proven at trial.

## COUNT IV
### NEGLIGENT MISREPRESENTATION

138.    Plaintiffs incorporate by reference paragraphs 1 through 95 above as if set forth at length herein.

139.    Plaintiffs accepted employment by TaskUs in part in reasonable and justifiable reliance on the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the terms and promises set forth in the Indemnity Agreement.

140.    Plaintiffs accepted employment by TaskUs in part in reasonable and justifiable reliance on the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the terms and promises set forth in the Indemnity Agreements.

141.    Plaintiffs remained employed by TaskUs and devoted substantial time and effort to the AI business of TaskUs in part in reasonable and justifiable reliance upon the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the terms and promises set forth in the Indemnity Agreements.

142.    Plaintiffs commenced and have prosecuted the legal action against Lionbridge in Japan, and have incurred considerable expenses to do so, in part in reasonable and justifiable

reliance upon the terms and promises set forth in the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the Indemnity Agreements.

143.    TaskUs knew or reasonably should have known that Plaintiffs would accept employment, remain employed, and perform their employment duties in reasonable and justifiable reliance on the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the terms and promises set forth in the Indemnity Agreements.

144.    TaskUs knew or reasonably should have known that Plaintiffs would commence and prosecute the litigation against Lionbridge in Japan in reasonable and justifiable reliance on the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the terms and promises set forth in the Indemnity Agreements.

145.    TaskUs intended to induce Plaintiffs to accept employment, remain employed, perform their employment duties, determine their rights, and commence and prosecute the litigation against Lionbridge in Japan in reasonable and justifiable reliance on the terms and promises set forth in the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the Indemnity Agreements, or was negligent in failing to know that Plaintiffs would accept employment, remain employed, perform their employment duties, and commence and prosecute the litigation against Lionbridge in Japan in reasonable and justifiable reliance on the terms and promises set forth therein.

146.    After reasonable opportunity for discovery and investigation, Plaintiffs believe the evidence will show that when TaskUs induced Plaintiffs to accept employment, remain employed, and perform their employment duties in reasonable and justifiable reliance on the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the terms and promises set forth in the Indemnity Agreement, TaskUs did not intend to perform pursuant to the

terms and promises set forth therein and intended to breach the Indemnity Agreement or was negligent in not knowing that it would fail to perform pursuant to the terms and promises set forth therein and would breach the Indemnity Agreement.

147. To the contrary, after reasonable opportunity for discovery and investigation, Plaintiffs believe the evidence will show that when TaskUs induced Plaintiffs to accept employment, remain employed, and perform their employment duties in reasonable and justifiable reliance on the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the terms and promises set forth in the Indemnity Agreement as alleged above, TaskUs failed to estimate or estimate properly the cost to perform its obligations under the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the Indemnity Agreement.

148. When TaskUs induced Plaintiffs to accept employment, remain employed, and perform their employment duties in reasonable and justifiable reliance on the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the terms and promises set forth in the Indemnity Agreements, TaskUs knew or reasonably should have known that the terms and promises set forth therein were false, untrue, and misleading, or that it would fail to perform pursuant to the terms and promises set forth therein and would breach the Indemnity Agreements.

149. Plaintiffs reasonably and justifiably relied upon the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the terms and promises set forth in the Indemnity Agreements and TaskUs's agreement to pay their Expenses thereunder.

150. TaskUs has failed and refused to perform pursuant to the terms and promises set forth in the assurances repeatedly given to Plaintiffs and the terms and promises set forth in the

Indemnity Agreements.

151.    Plaintiffs have been harmed as a direct, proximate, and foreseeable result of the fraud of TaskUs in amounts to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Matthew Skyrm and Matthew Romaine demand judgment in their favor and against Defendant TaskUs for the following relief:

A.    Compensatory and consequential damages in amounts to be proven at trial;

B.    Punitive damages for Defendant's fraud and malice;

C.    Pre- and post-judgment interest as allowed by law;

D.    Attorneys' fees and costs incurred in this action;

E.    Specific performance and temporary and permanent injunctive relief compelling TaskUs to advance covered Expenses within 30 days of submission and to pay past-due Expense advancement requests totaling $16,556.36; and

F.    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  January 30, 2026                    Respectfully submitted,


        /s/ Joe Kendall
        JOE KENDALL
        Texas Bar No. 11260700
        **KENDALL LAW GROUP, PLLC**
        3811 Turtle Creek Blvd., Suite 825
        Dallas, Texas 75219
        Telephone: 214/744-3000 / 214/744-3015 (fax)
        jkendall@kendalllawgroup.com

        Mark C. Rifkin (admitted *pro hac vice*)
        Benjamin Y. Kaufman (admitted *pro hac vice*)

27

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
270 Madison Ave. New York, NY 10016
Telephone: 212/545-4600
rifkin@whafh.com
kaufman@whafh.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on all counsel of record

on January 30, 2026 via CM/ECF, in accordance with the Federal Rules of Civil Procedure.

/s/ *Joe Kendall*
JOE KENDALL

28