**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

**MATTHEW SKYRM, MATTHEW ROMAINE,**

    *Plaintiffs*,

**v.**

**TASKUS, INC.,**

    *Defendant*.

Case No. 5:25-CV-01603-JKP

## MEMORANDUM OPINION AND ORDER

Before the Court are three motions:

1. Plaintiffs' Motion for Preliminary Injunction, (*ECF No. 14*);

2. Defendant's Rule 12(b)(1) Motion to Dismiss, (*ECF No. 24*); and

3. Defendant's Rule 12(b)(6) Motion to Dismiss, (*ECF No. 25*).

The parties fully briefed the motions. *See ECF Nos. 26, 30, 32, 33, 34, 35*. Upon consideration, the Court grants Defendant's Rule 12(b)(1) Motion to Dismiss, (*ECF No. 24*). The Court thus denies as moot Plaintiffs' Motion for Preliminary Injunction, (*ECF No. 14*), and Defendant's Rule 12(b)(6) Motion to Dismiss, (*ECF No. 25*).

## BACKGROUND

This case concerns the alleged breach by Defendant TaskUs Inc. ("TaskUs") of indemnity agreements between it and Plaintiffs Matthew Skyrm and Matthew Romaine. *See*, *generally*, *ECF No. 12*. As background, per the Amended Complaint, Plaintiffs Matthrew Skyrm and Matthew Romaine began working in the artificial intelligence field in 2010. *Id*. at 2.

As alleged, on May 1, 2021, Plaintiffs departed from their employment with Lionbridge Technologies LLC ("Lionbridge"), and on May 2, 2021, began their employment with TaskUs. *Id*. at 10. TaskUs employed Plaintiff Skyrm as Vice President, Head of AI Operations, and TaskUs employed Plaintiff Romaine as a consultant.[1] *Id*. at 10.

Prior to beginning their employment with TaskUs, Plaintiffs allege that—to induce them to accept employment—"TaskUs offered to indemnify Plaintiffs against certain losses in the event of adverse action taken by Lionbridge, including in particular assurances that TaskUs would indemnify Plaintiffs if Lionbridge breached their employment agreements by failing to grant them [restricted stock units ("RSUs")] or make any payments owed to Plaintiffs and to pay Plaintiffs' legal fees if they became involved in litigation with Lionbridge because of their departure from Lionbridge and subsequent employment by TaskUs." *Id*. at 10–11. Plaintiffs and TaskUs entered into indemnity agreements to this effect on January 21, 2021. *Id*. at 11.

Following Plaintiffs' departure from their employment with Lionbridge, Plaintiffs allege Lionbridge failed to pay them various amounts stemming from, among other things, bonuses and RSUs. *Id*. at 4–9, 13–14. Thereafter, "Plaintiffs commenced a legal proceeding in Japan against Lionbridge in which they asserted . . . claims based upon Lionbridge's failure to pay Plaintiffs their [bonuses] and [failure] to grant Plaintiffs any RSUs." *Id*. at 16.

Prior to September 2024, TaskUs routinely paid Plaintiffs' requests for payment of legal fees incurred in prosecuting Plaintiffs' action against Lionbridge in Japan as "Expenses" covered under the indemnity agreements.[2] *Id*. at 16. However, on October 18, 2024, in response to an inquiry from Plaintiff Skyrm, TaskUs abruptly informed Plaintiffs it would no longer pay any of

---

[1] On or about November 30, 2023, TaskUs terminated Plaintiff Skyrm's employment, and around that time ended Plaintiff Romaine's consulting engagement. *Id*. at 16

[2] In total, from 2021 to September 2024, TaskUs paid $134,016 in legal fees and expenses Plaintiffs incurred to prosecute the action against Lionbridge in Japan. *Id*. at 16.

Plaintiffs' "Expenses" under the indemnity agreements. *Id*. at 17. On that date, TaskUs sent a letter to Plaintiffs via email, signed by "TaskUs Legal," informing Plaintiffs it would cease making payments under the indemnity agreements and threatened to seek to recover all payments previously paid under the indemnity agreements. *Id*. at 17.

At present, Plaintiffs have incurred approximately 1,466,886 Japanese Yen (approximately $10,330) in unreimbursed legal fees and expenses to prosecute the action against Lionbridge in Japan and will continue to incur such fees and expenses until the action in Japan is concluded. *Id*. at 17. Plaintiffs further allege TaskUs's refusal to advance "Expenses" is impeding Plaintiffs' ability to fully prosecute claims against Lionbridge by preventing them from retaining specialized Delaware counsel and investigative resources concerning RSU issues. *Id*. at 17.

Thus, in sum, Plaintiffs allege TaskUs failed to perform its obligations under the indemnity agreements, including in particular its obligation to pay "the fees and expenses Plaintiffs have incurred and will continue to incur to prosecute the action against Lionbridge in Japan." *Id*. at 17. In the Amended Complaint, Plaintiffs assert causes of action for: (1) breach of contract; (2) promissory estoppel; (3) fraud; and (4) negligent misrepresentation. *Id*. at 18–27.

Following Plaintiffs' filing of the Amended Complaint, TaskUs sought leave to conduct jurisdictional discovery because Plaintiffs originally cited 28 U.S.C. § 1332(a)(2) as the basis for diversity jurisdiction in the Original Complaint and later cited 28 U.S.C. § 1332(a)(1) in the Amended Complaint. *See ECF No. 13*; *compare ECF No. 12* at 1 *with ECF No. 1* at 2. U.S. Magistrate Judge Elizabeth S. Chestney granted TaskUs' unopposed request, extending TaskUs' deadline to respond to the Amended Complaint by sixty (60) days. *See* Text Order Feb. 11, 2026.

TaskUs now moves to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), claiming the Court lacks jurisdiction over this case. *ECF No. 24*.

**LEGAL STANDARD**

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). They "must presume that a suit lies outside this limited jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking the federal forum." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). "When a [Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"] motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011) (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).

Rule 12(b)(1) requires dismissal of an action if a court lacks jurisdiction over the subject matter of the plaintiff's claim. There are two types of Rule 12(b)(1) challenges: a facial attack and a factual attack on a complaint. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). If the defendants present a "facial attack" under Rule 12(b)(1), a court need only look to the sufficiency of the allegations in the complaint, presumed to be true. If the defendants advance a "factual attack" on the district court's subject-matter jurisdiction, both sides may submit evidence. Thus, a court may find a plausible set of facts to support subject-matter jurisdiction by considering any of the following: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996). "Regardless of the nature of the attack, the plaintiff seeking a federal forum 'constantly bears the burden of proof that jurisdiction does in fact exist.'" *Chandler v. United States*, 338 F. Supp. 3d 592, 599 (N.D. Tex. 2018) (quoting *Ramming*, 281 F.3d at 161).

To carry the burden to prove the district court has diversity jurisdiction, a plaintiff[3] must show by a preponderance of the evidence (1) there exists complete diversity of citizenship between the parties; and (2) the amount in controversy exceeds $75,000, exclusive of interest and costs. *Garcia v. Koch Oil Co. of Tex. Inc.,* 351 F.3d 636, 638 (5th Cir. 2003); 28 U.S.C. § 1332.

To determine whether the claim is between citizens of different states, a district court must determine the domicile of the parties. *Id.* Domicile is established by "physical presence in a location coupled with an intent to remain there indefinitely." *In re Ran*, 607 F.3d 1017, 1022 (5th Cir. 2010) (citing *Texas v. Florida*, 306 U.S. 398 (1939)). The Fifth Circuit explains:

> A person acquires a "domicile of origin" at birth, and this domicile is presumed to continue absent sufficient evidence of change. There is a presumption of continuing domicile that applies whenever a person relocates. In order to defeat the presumption and establish a new domicile (the "domicile of choice"), the person must demonstrate both (1) residence in a new state, and (2) an intention to remain in that state indefinitely. There is no durational residency requirement in the establishment of domicile; once presence in the new state and intent to remain are met, the new domicile is instantaneously established.

*Id.* (internal citations omitted). A person's mere presence in a new location does not effect a change of domicile; instead, a person's domicile "persists until a new one is acquired or it is clearly abandoned" and "[t]here is a presumption in favor of the continuing domicile." *Coury v. Prot*, 85 F.3d 244, 250 (5th Cir. 1996).; *see also Acridge v. Evangelical Lutheran Good Samaritan Soc.*, 334 F.3d 444, 448 (5th Cir. 2003). It is one's domicile at the time the complaint is filed that is critical for determining whether diversity exists. *Coury*, 85 F.3d at 248-49 (citing *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989)).

Most courts regard domicile as presenting a mixed question of law and fact. *Coury*, 85 F.3d at 251 (citing *Village Fair Shopping Center Co. v. Sam Broadhead Trust*, 588 F.2d 431, 433

---

[3] "While some opinions seem to imply that the burden of persuasion rests with the party attempting to show a change of domicile, this is an overstatement. The proper rule is that the party attempting to show a change assumes the burden of going forward on that issue. The ultimate burden on the issue of jurisdiction rests with the plaintiff or the party invoking federal jurisdiction." *Coury v. Prot*, 85 F.3d 244, 250–51 (5th Cir. 1996).

(5th Cir. 1979). Nevertheless, in practice, the district court's determination of domicile is reviewed on appeal as a question of fact; it will be upheld unless "clearly erroneous." *Id*. (citing 1 J. Moore, Moore's Federal Practice § 0.74[3.–3] n. 29 and authorities cited therein).

**ANALYSIS**

### I.    Subject-Matter Jurisdiction

TaskUs presents a factual attack to Plaintiffs' assertion that there is complete diversity between the parties, arguing Plaintiff Skyrm and Plaintiff Romaine are U.S. citizens residing abroad. *ECF No. 24*. Thus, subject-matter jurisdiction here turns on whether Plaintiff Skyrm was domiciled in Florida and whether Plaintiff Romaine was domiciled in Washington when they filed this lawsuit on December 1, 2025, as alleged in the Amended Complaint. *See*, *ECF No. 1*. The Court will consider Plaintiff Skyrm and Plaintiff Romaine's domiciles in turn.

The Court first observes, however, Plaintiffs originally cited 28 U.S.C. § 1332(a)(2) as the basis for diversity jurisdiction in the Original Complaint and later cited 28 U.S.C. § 1332(a)(1) in the Amended Complaint. *Compare ECF No. 12* at 1 *with ECF No. 1* at 2. Therefore, when Plaintiffs commenced this action, Plaintiffs invoked diversity jurisdiction based upon identifying as "citizens or subjects of a foreign state," as defined by 28 U.S.C. § 1332(a)(2). *See ECF No. 1* at 1 (Plaintiffs identifying selves individually as "American citizen[s] currently residing in Japan"). That avenue is not available to U.S. citizens living abroad. *Newman-Green, Inc.*, 490 U.S. at 826. TaskUs reports in its Motion to Dismiss that it was not until after TaskUs' counsel notified Plaintiffs' counsel of this deficiency that Plaintiffs then filed the Amended Complaint claiming to be citizens of Florida and Washington. *See ECF Nos. 11, 12, 24*. This alone is suspicious.

Also suspicious is the lack of a factual record establishing Plaintiffs' residence and intent

to remain in these states, which the Court addresses at length below.

To the extent that Plaintiffs claim the Amended Complaint sought only to cure "jurisdictional allegations," pursuant to 28 U.S.C. § 1653, and that Plaintiffs seek for the Court to only review the state of things at the time Plaintiffs filed the Amended Complaint, the Court finds it necessary to address two principles pronounced by the Supreme Court. *ECF No. 32* at 5 n.1.

First, in this context, the Supreme Court differentiates "jurisdictional allegations" and "defective jurisdictional facts." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 831–32 (1989). The Fifth Circuit explains:

> While a district court can "remedy inadequate jurisdictional allegations," it cannot remedy "defective jurisdictional facts." [] The danger against which a court must guard is that a party will attempt to use § 1653 to retroactively create subject matter jurisdiction. *See* Moore et al., Moore's Federal Practice § 15.14[3], at 15–34 (3d ed. 1999) ("Essentially, a plaintiff may correct the complaint to show that jurisdiction does in fact exist; however, if there is no federal jurisdiction, it may not be created by amendment."). The cause for this concern is readily apparent: "never having had power to act in the matter, the court never had authority to permit an amendment to the complaint." *Falise,* 241 B.R. at 66.

*Whitmire v. Victus Ltd.*, 212 F.3d 885, 888 (5th Cir. 2000). Accordingly, 28 U.S.C. § 1653— providing that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts"—"does not apply to [situations] where diversity jurisdiction does not, in fact, exist." *Newman-Green, Inc.*, 490 U.S. at 831.

Second, while Plaintiffs seek for the Court to only review the state of things at the time Plaintiffs filed the Amended Complaint, the Fifth Circuit ""[i]t has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.'" *Grupo Dataflux v. Atlas Glob. Group, L.P.*, 541 U.S. 567, 570 (2004) (citing *Mollan v. Torrance,* 9 Wheat. 537, 539, 6 L.Ed. 154 (1824)). The Fifth Circuit explains:

> This time-of-filing rule is hornbook law (quite literally) taught to first-year law students in any basic course on federal civil procedure. It measures all challenges

to subject-matter jurisdiction premised upon diversity of citizenship against the state of facts that existed at the time of filing—whether the challenge be brought shortly after filing, after the trial, or even for the first time on appeal. (Challenges to subject-matter jurisdiction can of course be raised at any time prior to final judgment.

*Id*. at 570–71 (citations omitted). Accordingly, the Court will not consider steps Plaintiffs took after filing this case to establish a new domicile.

With these principles in mind, the Court proceeds to consider Plaintiff Skyrm and Plaintiff Romaine's domiciles—when this action commenced—in turn.

### A.    Plaintiff Skyrm

The question before the Court is whether Plaintiff Skyrm was a citizen of Florida when this action commenced, for the purpose of determining whether the parties are sufficiently diverse to invoke the Court's 28 U.S.C. § 1332(a) diversity jurisdiction.

In its Motion to Dismiss, TaskUs claims jurisdictional discovery, including Plaintiff Skyrm's deposition, revealed the following:

Mr. Skyrm is a dual citizen of America and France and a permanent resident of Japan . . . .

In 2007, he moved to Japan on a work assignment for Sony . . . . Sony twice extended the assignment and Mr. Skyrm worked for Sony in Japan until 2012 . . . . He joined Gengo K.K., a Japanese company founded by Mr. Romaine, that year . . . . He lived in Japan for the next 9 years while working for Gengo and then Lionbridge Technologies, LLC ("Lionbridge") after it acquired Gengo . . . . In 2017, Mr. Skyrm applied for and became a permanent resident of Japan . . . . He wanted this status so that he and his son would not have to "immediately leave" if he lost his employment and so that he could access services available only to permanent residents . . . . He renewed this status in 2024 and it is valid until 2031 . . . . In addition to being a permanent resident, Mr. Skyrm holds a Japanese driver's license and pays taxes in Japan . . . .

Mr. Skyrm joined TaskUs in 2021, but continued to live in Japan . . . . While living and working for TaskUs in Japan, Mr. Skyrm (and Mr. Romaine) sued Lionbridge, a company incorporated in Delaware, in Japan . . . . After TaskUs terminated Mr. Skyrm and the corporate housing lease it provided him in November 2023, Mr. Skyrm stayed in Japan . . . . In January of 2024, he purchased a condo

8

in Tokyo . . . Mr. Skyrm lived at this condo from January 2024 until December 28, 2025 and was in Japan when this action commenced on December 1, 2025 . . . .

In December 2025, Mr. Skyrm married a Japanese national whom he has been in a relationship with since 2018 . . . . On December 23, 2025, Mr. Skyrm and his wife submitted a move-out notice to his local ward office in Japan, stating that his family was leaving Japan on December 28, 2025 and going to Portugal . . . . On December 28, they flew from Tokyo to Florida with a layover in Houston . . . . Mr. Skyrm's written testimony stated this was his first time in Florida since at least January 1, 2009 . . . . Mr. Skyrm stayed in Florida for a month . . . . He stayed in an apartment at an apartment complex owned by a friend and did not pay rent . . . .

On January 5, 2026, Mr. Skyrm obtained a Florida driver's license, listing his friend's address as his residence . . . . He also obtained a library card and started receiving some mail at this address . . . . Mr. Skyrm left Florida on January 28, 2026 and has yet to return . . . . He spent time in New York and Ireland and has been in Portugal since February 10, 2026 . . . .

While living in Japan from 2007 to December 28, 2025, Mr. Skyrm testified that there were "some periods in that stretch that I spent time outside Japan" . . . . None were in Florida . . . . The only specific period and place identified by Mr. Skyrm was a work assignment in 2014 and 2015 where he stayed in California . . . .

Three documents from his time living in Japan—a 2015 life insurance policy, 2022 California driver's license, and 2025 renter's insurance policy—list three different residences for Mr. Skyrm in two states . . . . Mr. Skyrm testified that the first was his temporary corporate housing address in San Mateo, California, the second a friend's address in San Francisco, California, and the third his brother's address in Brooklyn, New York . . . . He claimed that listing domestic addresses where he did not reside as his residence was a "a common practice for expats on temporary assignments" . . . . On federal tax returns for 2021-2024, Mr. Skyrm listed his residence as his condominium in Tokyo . . . .

*ECF No. 24* at 3–6. TaskUs cites sixteen exhibits in support of these claims. *See ECF Nos. 31-1, 31-2, 31-3, 31-4, 31-5, 31-6, 31-7, 31-8, 31-9, 31-10, 31-11, 31-12, 31-13, 31-14, 31-15, 31-16.*

In his Response, Plaintiff Skyrm claims "[h]e last resided in the United States in California, where he lived until he went to work for Sony in Japan in 2007 . . . [and] retained his domicile in the United States in California until he changed his domicile on December 28, 2025, when

9

he took up residence in Florida with the intention to remain there permanently." *ECF No. 32* at 14.

As addressed above in the Court's discussion regarding the time-of-filing rule, because this action commenced December 1, 2025, steps Plaintiff Skym took after filing this case to establish a new domicile (in Florida) cannot be considered. The Court will therefore examine Plaintiff Skyrm's alternative claim he "retained" a California domicile after moving to Japan in 2007. *Id*.

> The Fifth Circuit explains:
>
> In determining a litigant's domicile, the court must address a variety of factors. No single factor is determinative. The court should look to all evidence shedding light on the litigant's intention to establish domicile. The factors may include the places where the litigant exercises civil and political rights, pays taxes, owns real and personal property, has driver's and other licenses, maintains bank accounts, belongs to clubs and churches, has places of business or employment, and maintains a home for his family. A litigant's statement of intent is relevant to the determination of domicile, but it is entitled to little weight if it conflicts with the objective facts.

*Coury*, 85 F.3d at 251 (citations omitted).

Here, Plaintiff Skyrm points to no evidence, such as documentation, regarding his alleged past residence in California or any intention to remain in or return to California. Plaintiff Skyrm does, however, cite an attached Declaration from himself in support of this claim stating:

> When I lived in California, I held a California driver's license (from 1999 to 2026), I was registered to vote in California from 1999 to 2025, and I have maintained a storage unit in California with my household furnishings since 2007, containing household furnishings from my residence in Palo Alto, California.
>
> . . .
>
> I intend to move to Sarasota, Florida full-time in the near future, and plan to remain there permanently. It has always been my intention to return to the United States, where my family lives and where my son intends to live after finishing University. I do not wish to pass away while living, even temporarily, outside the United States.

*ECF No. 32-2* at 3–4. Plaintiff Skyrm's allegations he held a California's driver's license, maintained his voter registration status in California, and paid for a storage unit in California are insufficient to establish domicile because they do not indicate a physical presence in the state. *See Williams v. Farmers Ins.*, No. 3:24-CV-02911, 2025 WL 1592959, at *3 n.6 (N.D. Tex. June 5, 2025). Further, it is clearly established that "a mere indefinite or future intention to choose some other domicile at some indefinite time in the future . . . cannot divest a present domicile to confer another." *Williams*, 2025 WL 1592959, at *4 (N.D. Tex. June 5, 2025) (citing *Hardin v. McAvoy*, 216 F.2d 399, 403 (5th Cir. 1954); *see also Hall v. Nestman*, 2015 WL 3948158, at *5 (W.D. Va. June 29, 2015) ("The fact that there may be some floating intention of moving elsewhere later, or even of returning to the old domicile, does not prevent a new domicile being acquired in the meantime." (citing *Granite Trading Corp. v. Harris*, 80 F.2d 174, 176 (4th Cir. 1935))); *Crowley v. Glaze*, 710 F.2d 676, 678 (10th Cir. 1983) ("A 'floating intention' to return to a former domicile does not prevent the acquisition of a new domicile.").

The Court therefore concludes Plaintiff Skyrm has not met his burden to prove he is domiciled in California (or Florida or any other state) and has not otherwise established subject-matter jurisdiction. Accordingly, the Court will grant Defendant's Rule 12(b)(1) Motion to Dismiss, (*ECF No. 24*), in this regard.

### B.    Plaintiff Romaine

The question before the Court is whether Plaintiff Romaine was a citizen of Washington when this action commenced, for the purpose of determining whether the parties are sufficiently diverse to invoke the Court's 28 U.S.C. § 1332(a) diversity jurisdiction.

In its Motion to Dismiss, TaskUs claims jurisdictional discovery, including Plaintiff Skyrm's deposition, revealed the following:

11

> Mr. Romaine is a dual citizen of America and Japan . . . . He split time between the countries as a child before completing graduate school in the United States . . . . After completing graduate school, Mr. Romaine moved to Japan for a job with Sony in 2002 . . . .
>
> After leaving Sony, Mr. Romaine founded two Japanese companies in 2006 and 2009 . . . . He sold the latter, Gengo, to Lionbridge in 2019 and worked for Lionbridge in Japan for the next two years . . . . He founded a third Japanese company in 2020, Shizen Capital, where he works today . . . . The company provides venture capital funding to Japanese businesses . . . .
>
> Mr. Romaine married a Japanese national in 2012 . . . . Both of his children were born in Japan and have not lived elsewhere . . . . His parents also live in Japan . . . . Mr. Romaine holds a Japanese driver's license and pays Japanese taxes . . . . In 2023, Mr. Romaine bought two apartment complexes in Tokyo that he still owns today . . . . At the time this action commenced, Mr. Romaine and his family lived in the Tokyo apartment they have leased since 2021 . . . .
>
> Mr. Romaine has not lived in the United States since 2002 . . . . He owns two investment properties in California . . . . His only United States mailing address is a personal mailbox in Houston, Texas . . . .
>
> Mr. Romaine has held a "personal expectation" that he would return to the United States since 2019 . . . . His sister moved to Washington sometime during the COVID-19 pandemic . . . . Mr. Romaine visited her from November 2, 2022 to November 8, 2022 . . . . At that time, he obtained a Washington driver's license and listed his sister's address as his residence . . . . He registered to vote in the state a month prior, also listing his sister's residence . . . . He also opened an account at a credit union in Washington in late 2022 . . . .
>
> Mr. Romaine returned to his home in Japan after spending just six days in Washington and has not returned to the state since . . . . He voted by overseas ballot from Japan in the 2024 election . . . . He testified that the only other action he has taken to move to Washington is "looking for other residences to consider in the state of Washington" on the internet . . . . Mr. Romaine does not lease or own property in the state . . . . He testified that he and his family may move back to the United States "by the time" his oldest child attends college . . . . His oldest child is seven . . . .

*ECF No. 24* at 6–8. TaskUs cites seven exhibits in support of these claims. *See ECF Nos. 31-17, 31-18, 31-19, 31-20, 31-21, 31-22, 31-23.*

In his Response, Plaintiff Romaine claims he is a citizen of Washington, stating he previously worked as an intern in Redmond, Washington in 1998, "moved" to Camas, Washington in

2022, holds a Washington driver's license, is registered to vote in Washington, and files tax returns using an address in Washington. *ECF No. 32* at 8–10.

> The Court repeats, the Fifth Circuit explains:

> In determining a litigant's domicile, the court must address a variety of factors. No single factor is determinative. The court should look to all evidence shedding light on the litigant's intention to establish domicile. The factors may include the places where the litigant exercises civil and political rights, pays taxes, owns real and personal property, has driver's and other licenses, maintains bank accounts, belongs to clubs and churches, has places of business or employment, and maintains a home for his family. A litigant's statement of intent is relevant to the determination of domicile, but it is entitled to little weight if it conflicts with the objective facts.

*Coury*, 85 F.3d at 251 (citations omitted).

Here, Plaintiff Romaine cites an attached Declaration in support of his claim he "moved" to Camas, Washington in 2022, but this contradicts his deposition testimony. *Compare ECF No. 32* at 9 and *ECF No. 32-1 with 32-18*. The Declaration states:

> In 2022, I moved to Camas, Washington, and I have a permanent residence there. I moved there to live with my sister. I have the right to return there any time while I look for a permanent residence of my own in Camas, Washington . . . .

> My connection to Washington began long before this litigation. In 1998, I worked as an intern in Redmond, Washington. That experience formed my first strong impression of Washington and the Pacific Northwest. Since then, I have retained a particular fondness for the Pacific Northwest and have long intended to return there to live permanently . . . .

> I intend to move to Camas, Washington full-time and when I do, I plan to remain there permanently. It has always been my intention to return to the United States, where my sister and her family lives . . . .

> In furtherance of my intention to return permanently to Washington, I have taken concrete steps to maintain and strengthen my Washington ties, including obtaining and maintaining a Washington driver's license, registering to vote in Washington, voting in Washington as an overseas voter, filing federal tax returns using my Washington address, maintaining United States bank and investment accounts using my Washington address, maintaining my life insurance and cellphone accounts using my Washington address, and receiving IRS correspondence and other mail at my Washington address.

*32-1* at 2. In his deposition testimony, however, Plaintiff Romaine recalled the only time he visited Washington since 2009 was for a six-day period from November 2, 2022, to November 8, 2022. *ECF No. 32-18* at 17. He visited his sister, at her address, who moved to Washington during the COVID-19 pandemic. *Id*. When asked if his sister owned or rented the house at her address, Plaintiff Romaine responded "I don't know who . . . I believe it's owned by her family . . . I don't know who exactly . . . It could be her . . . my brother-in-law." *Id*. at 19. Plaintiff Romaine confirmed he has not signed any leases in Washington and does not own any property in Washington. *Id*. at 23. Plaintiff Romaine also confirmed he still resides in the same residence in Japan he returned to after the six-day trip to Washington. *Id*. at 23. The evidence before the Court does not support Plaintiff Romaine "moved' to Camas, Washington by a preponderance of the evidence.

Further, while Plaintiff Romaine did obtain a Washington driver's license during the six-day trip to Washington, and registered to vote in Washington in September 2022, at most this provides some evidence that he began taking steps towards changing his domicile. *ECF No. 32-18* at 19–20. To acquire a domicile of choice, the law requires the physical presence of a person at the place of the domicile claimed, coupled with the intention of making it his *present* home. *Hardin v McAvoy*, 216 F.2d 399, 403 n.4 (5th Cir. 1954). When these two facts concur, the change in domicile is instantaneous. *Id*. Here, Plaintiff Romaine stated in his deposition testimony he has had a "personal expectation" he would be moving back to the United States since his first daughter was born in 2019. *ECF No. 32-18* at 20. When asked about the timeline for any move, Plaintiff Romaine stated the current plan is to move when his first daughter is "ready for college" and further stated that "[s]he's currently seven [(7) years old.]" *Id*. at 23–24. The evi-

dence before the Court therefore demonstrates only speculative plans by Plaintiff Romaine to make Washington his home in approximately ten (10) years.

The Court therefore concludes Plaintiff Romaine has not met his burden to prove he has established his domicile in Washington (or any other state) and has not otherwise established subject-matter jurisdiction. Accordingly, the Court will also grant Defendant's Rule 12(b)(1) Motion to Dismiss, (*ECF No. 24*), in this regard.

### CONCLUSION

For the reasons stated, the Court **GRANTS** Defendant's Rule 12(b)(1) Motion to Dismiss, (*ECF No. 24*). Because the Court lacks subject-matter jurisdiction, this matter is **DISMISSED WITHOUT PREJUDICE**. The Court thus **DENIES AS MOOT** Plaintiffs' Motion for Preliminary Injunction, (*ECF No. 14*), and Defendant's Rule 12(b)(6) Motion to Dismiss, (*ECF No. 25*).

The Clerk of Court is **DIRECTED** to close this case after entering the contemporaneously-issued Final Judgment.

It is so ORDERED.
SIGNED this 5th day of June, 2026.

_____
JASON PULLIAM
UNITED STATES DISTRICT JUDGE

15